1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
2               COLUMBIA DIVISION

_____ )
3                           )
UNITED STATES OF AMERICA,    )
4                           )
        Plaintiff,       ) Docket No. 1:23-cr-00024
5                           )
        vs.             ) Columbia, SC
6                           )
DAQUA LAMEEK RITTER,      )
7                           )
        Defendant.       )
8  _____ ) DATE:  October 17, 2024

9         BEFORE THE HONORABLE SHERRI A. LYDON
         UNITED STATES DISTRICT JUDGE, PRESIDING
10              SENTENCING HEARNG

11   A P P E A R A N C E S:

12   For the Plaintiff:

13   BENJAMIN NEALE GARNER, BROOK BOWERS ANDREWS,
     and ELLE KLEIN
14   U.S. Attorney's Office
     1441 Main Street, Suite 500
15   Columbia, SC 29201
     (803) 929-3063
16   benjamin.garner@usdoj.gov, brook.andrews@usdoj.gov,

17   JOSHUA SNOW KENDRICK
     Kendrick and Leonard
18   P.O. Box 6938
     Greenville, SC 29606
19   864-760-4000
     Email: josh@kendrickleonard.com
20

     LINDSEY STERLING VANN
21   Justice 360
     900 Elmwood Ave., Suite 200
22   Columbia, SC 29201
     803-765-1044
23   Email: lindsey@justice360sc.org

24   COURT REPORTER:  Karen V. Andersen, RMR, CRR
                   United States Court Reporter
25                  901 Richland Street
                   Columbia, SC  29201

1    The COURT:  All right.  Mr. Garner, you may call

2  the case.

3    MR. GARNER:  Thank you, Judge Lydon.  This is the

4  matter of United States of America v. Daqua Ritter.  It's

5  Criminal Docket No. 1:23-24.  We are here in the matter of

6  sentencing.  The government has reviewed the presentence

7  investigation report and submitted no objections to the

8  report.

9    THE COURT:  Okay.  Thank you.

10    All right.  Good afternoon, Mr. Kendrick and Ms.

11  Vann.

12    MR. KENDRICK:  Good afternoon, Your Honor.

13    THE COURT:  And, Mr. Ritter.  Are you all ready

14  to proceed?

15    MR. KENDRICK:  We are, Your Honor.

16    THE COURT:  All right.  Let me state for the

17  record that a jury previously returned a guilty verdict as

18  to Counts 1, 2, and 3, of the indictment.  The presentence

19  report has been prepared by the United States Probation

20  Office, and as the government mentioned, a copy furnished

21  to the government and the defendant.  The government had

22  no objections to the presentence report.

23    Mr. Ritter, let me ask you, did you have a chance

24  to review the presentence report, including any revisions

25  and addendums?

1      THE DEFENDANT:  Yes, ma'am.

2      THE COURT:  Did you feel like you had all the

3  time you needed to do that?

4      THE DEFENDANT:  Yes, ma'am.

5      THE COURT:  Did you go over it with your lawyers?

6      THE DEFENDANT:  Yes, ma'am.

7      THE COURT:  All right.  And, Mr. Kendrick, if you

8  will confirm that.

9      MR. KENDRICK:  Yes, ma'am.

10      THE COURT:  And I understand the defendant did

11  have some objections.

12      MR. KENDRICK:  There essentially are two, Your

13  Honor.  The first one I'm going to classify as a group,

14  where we objected to a number of the facts that came out

15  at trial.  We lost the trial.  And then Your Honor had a

16  very detailed motion on the evidence that you ruled

17  against us on.  So I think that falls under Rule 32, that

18  it's not going to affect the sentence.  So if you will

19  just note that we made that objection, we don't need to

20  actually further argue it.

21      THE COURT:  All right.  Ms. Vann, Mr. Ritter, you

22  may have a seat.  And so to Objection 1, or addressing

23  Objection 1 in the paragraphs listed there under "the

24  defendant concedes that no ruling is necessary," and,

25  therefore, under Rule 32, I do decline to rule on that

1    objection, but it is noted for the record.  You may

2    proceed with your second objection.

3          MR. KENDRICK:  Thank you, Your Honor.  And we

4    laid this out in writing.  I will note that I apologize

5    that I had three subheadings.  And I think subheading 2

6    and 3 are the exact same.  I don't know why I did that,

7    but I didn't mean to.

8          But I am not going to belabor this, because I

9    think we laid out the law clearly in our memo.  I just

10   wanted to give you the essentials of our argument so it's

11   clear on the record that it is our position that a

12   first-degree murder charge has to be charged with one of

13   the four elements.  So in this case, I think premeditation

14   is the only one that could conceivably apply.  There's

15   three others that I don't believe would have any bearing

16   here.

17         And there is a case *United States v. Jackson* that

18   I may not have cited in the writing, 32 F.4th 278 at 286.

19         THE COURT:  I'm sorry.  Would you give me that

20   cite again.

21         MR. KENDRICK:  32 F.4th 278 at 286.  And that's a

22   2022 Fourth Circuit case.  And only reason we cited it is

23   that the court says that to essentially be guilty of

24   premeditated murder, the government must prove a person

25   intended to kill the victim.  And they go on to say

there's one of four ways. And the jury would have to

agree the way, and each of the 12 jurors would have to

agree on the same means. And that's -- the case,

actually, addresses divisibility. So what I used it for

is the authority that I think goes along with our argument

that, had this been charged as a first-degree murder, then

we would have had the ability to at least address in our

greater defense whether there was evidence of

premeditation. The jury could have ruled on it.

And, of course, if they had found him guilty of a

second-degree murder, then the first-degree murder would

have become acquitted conduct. And even though for the

next few weeks that could conceivably be used to sentence

him, under the new guidelines, I think they are not using

acquitted conduct. And it would have a pretty serious

effect on the available sentence. So our position is,

while we recognize relevant conduct issues, this is a very

specific pleading requirement to get to the first-degree

murder.

Just briefly, the other things that we argued

related to that, Your Honor, are that there's a due

process issue that is very foundational that we should

know exactly what we will be facing.

I will just make sure -- then I think the second

argument, Your Honor, is that even if it had been charged

1    that way, we object that the evidence that was put forward

2    in court does not meet what we commonly know of as

3    premeditation.  I think that if you look at the country at

4    both state and federal courts, there are a number of

5    factors.  A lot of those cases seem to conflate it with

6    malice aforethought by just saying it's some intent to

7    kill before the murder.  That's not premeditation.  That

8    is malice aforethought.  So we believe there would be a

9    constitutional problem with conflating those two elements.

10         And then, you know, for example, most of the

11   cases talk about some time for reflection, some ability to

12   make a plan.  But nobody has a very consistent definition.

13   But, you know, I think the combination of our objections,

14   in addition to anything we put in the written memo, is

15   that, essentially, it's a due process argument.  It's a

16   pleading problem.  And we think there is factual

17   insufficiency.

18         THE COURT:  Okay.  I think the standard you

19   referenced in your sentencing memo on page 6 was some sort

20   of conscious and careful planning of a crime.

21         MR. KENDRICK:  And I believe that is one of the

22   ways -- I think that's probably -- if you were to look at

23   all of the different ones, there's an amalgam of that.

24   But, essentially, it's not malice aforethought, where you

25   form an intent to kill and do it.  So we don't think that

the evidence for the record reflected that he had the

opportunity to consciously and carefully plan it.

And it does run somewhat against the government's

theory that this was a killing based on some type of

jealousy or anger related to what you heard at trial.  So

that's our objection on that, Your Honor.

THE COURT:  Okay.  All right.  Let me hear from

the government.

MR. GARNER:  Thank you, Judge Lydon.  The

government opposes the application of the second-degree

murder cross-reference and urges the Court, consistent

with the presentence investigation report, to cross

reference first-degree murder.  As I understand defense's

argument, it's predicated -- well, first, we acknowledge

that there's binding Fourth Circuit precedent that's over

two decades old that holds that a defendant need not be

formally charged with first-degree murder when holding a

defendant accountable for such conduct under the

sentencing guidelines.  That decision -- there's binding

agreement and a published decision from the Seventh

Circuit.

And as I understand the defense's argument, it's

that the Fourth Circuit precedent was predicated upon the

Supreme Court's decision in *Watts*, that *Watts* was

implicitly overruled by the Supreme Court's more-recent

1    decision in *Kisor*.

2         I think the problem with that argument is that

3    the Supreme Court has made clear to lower courts that it's

4    the Supreme Court's prerogative to tell lower courts when

5    it elects to overturn its prior precedent.  The Fourth

6    Circuit -- excuse me.  The Supreme Court, when deciding

7    *Kisor*, did not indicate that it was overruling its prior

8    decision in *Watts*.  And as far as the government is aware,

9    defense counsel certainly has not cited and the government

10   has not found any district either court or circuit court

11   across the country that has so held that *Watts* is no

12   longer good law pursuant to the Supreme Court's decision

13   in *Kisor*.  So for those reasons --

14        THE COURT:  Well, let me stop you there for just

15   a minute.  Do I even have to get to *Watts* to consider this

16   conduct?  Isn't there other authority that -- you know,

17   without having to get to commentary -- that allows me to

18   consider this conduct?

19        MR. GARNER:  Your Honor, it's the government's

20   position that just a straightforward application of the

21   guidelines themselves would get you to the premeditated

22   murder.  Just relying upon the 1B1.3(1)(A) allows the

23   Court to take into consideration all acts commissioned --

24   committed, aided, abetted, counseled, commanded, induced,

25   procured, or willfully caused by the defendant during the

1    offense conduct.

2           The Court will recall that during the trial of

3    this case, the government produced evidence showing that

4    prior to the murder, this defendant had issued threats

5    threatening to harm the victim, Dime Doe, because of the

6    rumors that were circulating around the community that he

7    was in a sexual relationship with Dime.  There's also been

8    evidence induced that the day of the murder, that he

9    acquired a firearm, that he borrowed a cell phone from one

10   of his close friends, used that cell phone to lure the

11   victim to the defendant, directed the victim to a rural

12   location in Allendale County where he murdered the victim.

13   That location happened to be half a mile away from the

14   defendant's uncle's house.  He then went to --

15   unexpectedly showed up at his uncle's house to get a ride

16   back home to Allendale.

17          All of that shows premeditation, planning prior

18   to the murder of Dime Doe.  So it's the government's

19   position that the Court need not weigh in in terms of

20   application of the commentary.  It can apply.  The

21   guideline itself in terms of relevant conduct reach the

22   same conclusion that the first-degree cross-reference

23   applies.

24          THE COURT:  All right.  Anything else?

25          MR. GARNER:  Not from the government, Your Honor.

1          THE COURT:  Mr. Kendrick, anything else?

2          MR. KENDRICK:  No.  Just briefly, Your Honor, and

3     I didn't really push the *Watts* argument, but I think we

4     maintained it.  But I think the stronger argument is that

5     if all of that is true, then we've had trial by

6     cross-reference.  And that is probably our strongest

7     argument that the government, I think, is required to

8     plead premeditation.  That's a 2022 published case that

9     seems to suggest a jury has to make that finding.  And I

10    understand that there's other law against us.  So I am not

11    trying to not be candid with the Court, but I am

12    maintaining that objection and argument.

13         THE COURT:  I'm trying to figure out what that

14    would do to the guidelines.  You know, let's say we had a

15    felon-in-possession charge that came out of a bank

16    robbery, but the banker robbery wasn't charged, just the

17    felon in possession.  Sentencing judge can't consider

18    that?

19         MR. KENDRICK:  I have that issue in Fourth

20    Circuit right now, Your Honor.  I don't expect what they

21    will do with it, but, absolutely, I will take that

22    position.  It's just absolutely against the long history

23    of criminal justice.

24         THE COURT:  Oh, not the long history of

25    sentencing judges being able to have broad discretion in

1  what they can consider at sentencing?

2       MR. KENDRICK:  No.  I understand, Your Honor.  I

3  think the argument I have made, which is almost identical

4  to the facts you just named, different crime, but, yes,

5  that one of the oldest functions of criminal justice or

6  foundations is that you know what you are charged with and

7  you know what to answer.  We've gotten away from that.  We

8  are moving back towards it.

9       I will also tell Your Honor, so that you do not

10  think I've just lost my mind, that there are opinions out

11  there that I have found that fault lawyers for not raising

12  issues that are colorable even if there's binding

13  authority against them.  So I'm always hesitant to say --

14  I understand your point, that that would throw things into

15  disarray, but so did *Apprendi*.  There are cases that come

16  out all the time that throw things into disarray.  So we

17  have to advance the argument.  But I don't think it's

18  frivolous.

19       And I do think if you take all of the cases and

20  harmonize them, it is a sensible solution, although I

21  recognize that I have not won that anywhere, what you are

22  pointing out.

23       THE COURT:  All right.  And I certainly didn't

24  mean to imply that it was frivolous.

25       MR. KENDRICK:  No.  No.  And I didn't take it

1    that way.  I just want you to know that it is a

2    well-thought-out objection.  And I don't want a higher

3    court to review this and think I'm conceding it.  I'm just

4    recognizing that, in candor to the Court, the law is not

5    on my side.

6            THE COURT:  Well, I understand that.  And you

7    always are very thorough and thoughtful in your defense of

8    your clients.

9            Mr. Garner, is there anything else you wanted to

10   add?

11           MR. GARNER:  No, Your Honor.

12           THE COURT:  All right.  I overrule the objection.

13   No, the defendant was not charged with first-degree

14   murder, the underlying offense used by probation in

15   determining the offense level.  The defendant was,

16   however, charged with knowingly using and discharging a

17   firearm and causing the death of Dime Doe in such a manner

18   as to constitute murder as defined by 18 U.S.C. 1111.  18

19   USC 1111 defines murder as an unlawful killing of a human

20   being with malice aforethought.

21           First, the defendant argues that the Court cannot

22   consider evidence of premeditation because it was not

23   charged in the indictment.  And this argument simply is

24   not consistent with both Supreme Court and Fourth Circuit

25   precedent.

The defendant's statutory range prescribed by the jury's verdict is life.  So the fact that premeditation was not charged in the indictment does not undermine my ability to impose a life sentence.  The failure to allege premeditation does not change the statutory range.  The Supreme Court's decisions in *Apprendi*, *Alleyne*, and *Erlinger* all support this conclusion.

And the Fourth Circuit has approved of a cross-reference to first-degree murder where premeditation was not alleged in the indictment.  And that's *United States v. Ball*.  Also, the Fourth Circuit recently rejected a claim that a sentencing enhancement must be decided by the jury.  *United States v. Russell*, the cross-reference applied here, essentially works as a sentencing enhancement.

And the Fourth Circuit has not held that every fact related to a cross-reference or enhancement must be set forth in the indictment and found by the jury.  Again, to find so here would run afoul of *Apprendi* and the reasoning of *Booker*.

The defendant also raises a *Kisor* argument, and inserts the language in 6A1.3 is unambiguous, so this Court is not permitted to look to the commentary to include uncharged conduct.  But under 6A1.3, we can still "consider relevant information without regard to its

admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

As the body of the guideline, not as commentary states, uncharged conduct as relevant information and common sense supports the determination that premeditation is relevant information in the sentencing calculus.

Chapters Two (Offense Conduct), and Three (Adjustments). Unless Otherwise specified, the base offense level where the guideline specifies more than one base offense level, specific offense characteristics and cross references in Chapter Two, and Rule Section IV, adjustments in Chapter Three shall be determined on the basis of the following:

1B1.3(1)(A), all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and all harm that resulted from the acts and omissions specified in subsections (A)(1) and (A)(2) above, and all harm that was the object of such acts and omissions, and any other information specified in the applicable guideline.

These are within the body of the guidelines and not the application notes. So the defendant can and should be held accountable for Chapters 2 and 3 guidelines for all acts he committed, all harm that resulted from

those acts, all harm that was the subject of those acts,

and any other information specified in the guideline.

2H1.1 tells us to use another guideline. So "any

other information" within that specified guideline would

be the direction to use the underlying guideline, which is

2A1.1.

Also, regarding the use of a firearm count, the

guideline in the index tells us to use either 2A1.1 or

2A1.2.

And then to repeat, 6A1.3 allows us to use any

information, again, which has sufficient indicia of

reliability to support its probable accuracy. The

evidence presented at trial proved with sufficient indicia

of reliability that the defendant's conduct was

premeditation. And based on that premeditation, which was

acts committed by the defendant, we determine the

appropriate guideline was murder first and not murder

second.

Further, the premeditated nature of this conduct

caused Dime Doe's death. And the death is the "harm" that

resulted from the facts."

And finally, the *Kisor* argument is also

unpersuasive to me because of the broad discretion a

sentencing judge has to consider all kinds of information

under 18 U.S.C. 3661.

1      The defendant's next argument, he's attacked the

2   use of the preponderance of the evidence standard in

3   federal sentencing.  In numerous cases, the Fourth Circuit

4   has endorsed the preponderance of the evidence standard in

5   determining the guideline range, including enhancements

6   and cross-references.  Some of those cases are *United*

7   *States vs. Grubb* and *United States v. Davis*.

8      Also, in *United States v. Carter*, the Fourth

9   Circuit held that a defendant does not need to be formally

10   charged with first-degree murder to be held accountable

11   for such conduct under the sentencing guidelines so long

12   as the preponderance of the evidence supported a finding

13   that the defendant committed such conduct.

14      The defendant's argument is also undermined by

15   *Booker*, as the post-*Booker* advisory nature of the

16   guidelines eliminates any due process argument for a

17   heightened standard of proof at sentencing.  The advisory

18   guidelines require the sentencing court to make findings

19   of fact.  But none of these facts alter the Court's final

20   sentencing authority.  These findings just inform the

21   Court's discretion.

22      And finally, the Sentencing Commission says that

23   the preponderance of the evidence standard satisfies a

24   defendant's due process guarantees.

25      Third, the defendant goes on to argue that

probation incorrectly relies on the *Ball* decision.  He

argues *Ball* fails to support the cross-reference because

*Ball's* language "conscious purpose to kill" isn't an

appropriate standard for premeditation, and that the

evidence presented at trial and outlined in the PSR was

also insufficient to prove premeditation.

From page 6 of his sentencing memorandum, he

states, "premeditation should require some conscious and

careful planning of a crime."  Whether the standard in

*Ball* espoused by the Fourth Circuit is correct, the Court

is obligated to apply the precedent.

It is also noted that in a later unpublished

case, *United States v. Wilson*, 2022 Westlaw 998986, Fourth

Circuit, April 4th, 2022, the Fourth Circuit applied *Ball*

when it determined a cross-reference to first-degree

murder was appropriate based on the district court's

finding of premeditation.

In *Wilson,* the evidentiary sufficiency seemed

less compelling for a first-degree murder finding than in

this case.  Specifically in *Wilson*, the Fourth Circuit

concluded the district court did not err in applying the

cross-reference.  The district found that Wilson had a

history of conflict with the victim, and had recently

completed a prison sentence imposed after he assaulted the

victim by pointing a firearm at him on an earlier

occasion.

During the current offense, Wilson encountered the victim in the midst of a protracted argument with the victim's sister. Wilson briefly left the area, aware that the victim had arrived, but made the decision to return while armed. Intending to end any conflict with the victim before it started, Wilson approached the victim and fired one shot into his neck. The court acknowledged Wilson's comments to law enforcement that he did not want to hurt the victim and hoped that the victim lived, but it found these post hoc statements unpersuasive in light of Wilson's conduct. "Based on these findings and despite any tendency Wilson may have had toward impulsivity, we find sufficient support for the district court's determination that more likely than not, Wilson acted with premeditation."

Finally, the defendant argues here that there is just insufficient evidence of premeditation in this case. In this case, the facts supporting premeditation are damning. There is evidence which has a sufficient indicia of reliability to support its probable accuracy.

I presided over Mr. Ritter's trial. And certainly, there was evidence presented at trial that the defendant demonstrated conscious and careful planning of this crime. He planned the use of someone else's cell

phone to call Dime Doe, and arranged for her to pick him

up, knowing what he was going to do.  He texted her from

Xavier Pinckney's phone, asking Dime to meet with him.

Furthermore, the defendant obtained a firearm for

the purposes of murdering Doe.  He learned -- lured her by

trick to a secluded location using someone else's phone.

He then directed her to an even more secluded area where

he shot her in the head once.  And after he shot her in

the head, her vehicle rolled forward.  So he shot her two

more times in the head for good measure.

I recall the evidence of Mr. Ritter's text

conversations with Dime Doe.  He changed the manner in

which he normally talked to her so that he could lure her

into meeting with him.  His insistence and enthusiasm for

meeting with her and getting together with her was new.

And the victim noticed the change.  Indeed, his actions

were so manipulative that the victim actually expressed

concern that she thought he was up to something and might

intend to hurt her.  The evidence was chilling.

As noted in the presentence report and presented

at trial, Doe questioned Ritter as to whether she should

meet with him because, as she put it, "I'm scared; might

try to do something to me."  Ritter denied it, "On God, I

am not trying to do nothing to -- on my son, I am not

trying to hurt you or nothing."

Although Doe agreed that she wanted to reconcile their relationship, she again reiterated, "But no lie, I'm scared."  Ritter denied he wanted to hurt her, "I just told you, I am not on that.  You have no reason to be scared."

But Dime later noted, "That's what makes me scared to come, because you are so eager for me to meet."

Doe and Ritter continued going back and forth about whether Doe should come to Ritter's house; however, Doe again suspected, "It kind of feels like a setup.  No lie, I'm scared.  I ain't never heard you talk like that.  You always was like you wasn't with it."

Based on this analysis and review of the facts presented at trial and careful review of the defendant's objection, the sentencing memorandum, the arguments presented here today, the government's arguments, and the defendant's arguments, presentence report, probation officer's response to defendant's objections in the addendum to the presentence report, I find that the defendant unlawfully and maliciously murdered Dime Doe with malice aforethought and that the murder was committed with premeditation so as to support the application of the first-degree murder guideline.

Further, I find that the evidence presented at trial and relied upon when calculating this guideline has

1    sufficient indicia of reliability to support its probable

2    accuracy and to meet the preponderance of the evidence

3    standard, which is all that is required when applying this

4    guideline.  Accordingly, the objection is overruled.

5         Mr. Kendrick, did I understand that there wasn't

6    intended to be another objection?  There was another

7    objection about the calculation is wrong.  But I think

8    based on my overruling the objection we just addressed, I

9    would necessarily then overrule Objection 3.  But you may

10   take a look at that and tell me what you think.

11        MR. KENDRICK:  I think -- yes, ma'am.  I think we

12   just -- based on that objection you overruled, we just

13   objected to the calculations.  And I split them out for

14   some reason, but you've addressed all the objections we

15   made.

16        THE COURT:  Thank you.  All right.  Inasmuch as

17   all the parties have had access to the report and there

18   are no outstanding objections to the report, I will ask

19   the clerk to file the report under seal.  In the event of

20   an appeal, the clerk will make the report available to

21   counsel for appellate purposes.

22        Additionally, the probation officer has made a

23   recommendation to the Court regarding this sentence.  And

24   I will ask the clerk to file that recommendation under

25   seal, and it will remain under seal until further order of

1    the Court.

2          In view of the fact that there are no further

3    objections to the factual statements contained in the

4    presentence report, the Court will adopt those statements

5    as the finding of fact for purposes of sentencing.

6          Are there any objections to the matters which

7    have been so adopted from the government?

8          MR. GARNER:  No, Your Honor.

9          THE COURT:  Preserving your earlier objection,

10   anything further, Mr. Kendrick?

11         MR. KENDRICK:  Nothing beyond what we've already

12   stated.

13         THE COURT:  Thank you.  Having concluded the

14   fact-finding phase of the hearing, we will move on to

15   determine which guidelines apply.  Based upon a total

16   offense level of 43 and a criminal history category of I,

17   the guideline imprisonment range is life.  Restitution is

18   $980.76.

19         The statutory provisions provide for a maximum

20   term of life as to Count 1, death or any term of years or

21   life as to Count 2, and maximum of 20 years as to Count 3,

22   not more than five years supervised release as to Counts 1

23   and 2, and not more than three years supervised release as

24   to Count 3.

25         Probation is prohibited, a $250,000 fine as to

1   each count, plus cost of imprisonment, probation,

2   supervised release, and a mandatory special assessment of

3   $100 per felony, for a total of $300.

4          Assuming my previous factual determinations are

5   correct, does the government have any objection as to the

6   stated applicable guideline range?

7          MR. GARNER:  No, Your Honor.

8          THE COURT:  Does the defendant?

9          MR. KENDRICK:  No, Your Honor.

10         THE COURT:  All right.  I will hear from the

11  government first as to its position on sentencing.

12         MR. GARNER:  Thank you, Judge Lydon.  And I

13  certainly recognize, given the Court's participation and

14  observation of the jury trial of this case, the post-trial

15  litigation that took place, which required the Court to

16  make independent findings, as well as its review of the

17  presentence investigation report, that the Court is very

18  well aware of this case, the facts and circumstances, the

19  3553(a) factors that likely apply in this case.  And,

20  therefore, I will not belabor the government's

21  presentation; however, I'm more than happy to answer any

22  questions the Court has.

23         There are a few points I want to underscore that

24  I think are important from the government's perspective

25  and have framed the government's recommendation,

1    sentencing recommendation for the Court.

2            The first thing I wanted to mention to the Court

3    is that in considering the appropriate recommendation, and

4    given some of the unusual facts of this case, I tried to

5    find some comparators throughout other cases in which

6    federal offense of conduct had taken place.  There's one

7    federal case that I found from the district -- Southern

8    District of Mississippi.  That was the case of *United*

9    *States of America v. Vallum.*  In that case, the defendant

10   had engaged in a romantic relationship with a transgender

11   victim -- transgender woman.  The relationship was secret.

12   And Vallum had murdered his partner because he was worried

13   that the relationship had been exposed and exposed by

14   virtue of the victim.

15           THE COURT:  Mr. Garner, can I interrupt you for

16   the cite, and would you spell the name?  I couldn't tell

17   if it was Bound.

18           MR. GARNER:  V-a-l-l-u-m.  And we are looking at

19   up the case number right now.  But I will certainly

20   provide it to you prior to the conclusion of my

21   presentation.

22           THE COURT:  Okay.  You may continue.

23           MR. GARNER:  And after murdering the victim, the

24   defendant had disposed of the murder weapon as well as

25   other evidence in the case.  The court in that case

1    sentenced Mr. Vallum to a term of imprisonment of 49

2    years.  I think while the offense conduct is similar, I

3    think some of the things that distinguishes Mr. Vallum's

4    case from Mr. Ritter is Mr. Vallum accepted responsibility

5    for his conduct.  He had pled guilty to the offense rather

6    than elect to proceed to trial, acknowledging his guilt to

7    the victim and the victim's family.

8            The other case that I want to bring to the

9    Court's attention is a case from Pennsylvania for which

10   the defendant was sentenced just three weeks ago.  It was

11   a state court case where a 23-year-old by the name of

12   Kylen Pratt was sentenced following his conviction for

13   killing a 20-year-old named Naasire Johnson.  This was

14   also a hate crime.

15           And evidence presented at the trial was that the

16   defendant was in the same-sex relationship with the

17   victim, and that the defendant did not want anyone to find

18   out about the relationship with the victim.  The judge

19   three weeks ago sentenced Mr. Pratt to life incarceration

20   without opportunity for parole, followed by

21   four-and-a-half to nine years consecutive to the life

22   sentence.  The *Vallum* case, Your Honor, I have a district

23   court docket number, and that's 1:16-114.  It's from the

24   Southern District of Mississippi.  And that prosecution

25   concluded in 2016.

1    THE COURT:  All right.  Thank you.

2    MR. GARNER:  Your Honor, in addition to the

3    comparators, I just wanted to -- I feel compelled to flag

4    what, to me, seems as the particularly egregious component

5    in the senselessness nature of this case.  And that's to

6    step back and be reminded that Ritter killed Dime all

7    because he was embarrassed about a relationship and about

8    this girlfriend finding out about the relationship and

9    about other individuals in the Allendale community

10   discovering or at least hearing about the relationship

11   with Dime.

12       This wasn't a murder over some sort of financial

13   gain.  This wasn't a heat-of-the-passion quarrel between

14   lovers.  It was over nothing other than Mr. Ritter's

15   concern about his social standing in a community from

16   which he wasn't even a citizen.  He spent the vast

17   majority of his life in New York.  The sensible thing that

18   a moral, law-abiding citizen would have done in those

19   circumstances is leave Allendale, not murder Dime.

20       Your Honor, the third point I want to make is to

21   reflect -- to reflect upon the impact that Ritter's

22   conduct has had.  It has had a significant impact on the

23   community of Allendale.  You have seen throughout the

24   trial many of the government's witnesses, to include

25   Dime's friends, who testified about their relationship

with Dime and the consequences that have resulted by
virtue of her murder.  You have heard testimony from
Ritter's friends while he was spending the summer of 2019
in Allendale.  You know firsthand that he intentionally
brought some of these friends into the offense conduct so
that he could accomplish Dime's murder.

You are very well aware of Xavier Pinckney.  You
saw him testify.  You sentenced him to four months
incarceration.

And you are aware of the abject poverty that this
community is inflicted with.  This is insult -- this
entire conduct is insult to injury to the entire
community.

Your Honor, in addition to the community of
Allendale, this also has an impact on the LGBT community
at large.  Hate crimes, while they inflict devastating
harm on those directly involved, they also sow fear in the
entire community.  And FBI statistics show that across the
country, hate crimes against the LGBT community have been
on the rise nationwide, as well as in the district of
South Carolina.  This is an opportunity to send a message
to deter others that these offenses will not be tolerated.

Your Honor, finally, and I think arguably most
importantly, is the impact felt upon the victim's family.
You will have the opportunity to hear from Dime's mother,

1  Deborah Saab, in just a few minutes, or whenever it's

2  convenient for the Court.

3       Victim impact statements have been provided by

4  many of the family members.  And I just want to underscore

5  some of their sentiments in terms of the impact that

6  Dime's murder has had on them and their family.  Dime's

7  mom writes to the Court in her statement regarding the

8  "devastating effect of Dime's murder" and the "constant

9  cries, the loneliness and the emptiness" she feels after

10 losing her only child to Ritter.

11      Dime's aunt reflected that "the actions of Mr.

12 Ritter" -- that "the actions of Mr. Ritter has placed a

13 downspiraling turmoil on my family.  It has taken me

14 approximately three years to even mention Dime's name

15 without bursting into tears.  My family has suffered

16 greatly at the hands of Daqua Ritter and his malicious

17 actions."

18      Dime's cousin reflected, "what Ritter took from

19 me was a best friend I would never be able to get back.

20 But, honestly, I'm glad they caught him so he won't be

21 able to hurt anyone else.  Hopefully, he gets life for

22 taking a precious one like Dime.  So heartbreaking."

23      Your Honor, in summary, it's the government's

24 position that balancing all of the 3553(a) factors, taking

25 into consideration the nature and circumstances of the

offense, the history and characteristics of this

defendant, as well as the need to deter others, it's the

government's position that a motion for a downward

variance is unwarranted.  Dime's family has expressed very

clearly in their victim impact statements to the Court

that they would like the Court to impose a sentence of

life incarceration, which is the advisory guideline range.

The government joins in that request.  Thank you.

THE COURT:  Did you wish for me to hear from Ms.

Saab at this point?

MR. GARNER:  Yes, Your Honor.

MS. SAAB:  Good evening, Your Honor.  My name is

Deborah Saab, and I'm Dime's mother.  I just want to come

up and speak on behalf of Dime today.  This has been very

devastating for me and my family.  This took a toll on us.

Every day is a struggle, Your Honor.  I am not supposed to

be up here standing talking about Dime.  Dime should be

here with me.

Your Honor, my baby did not deserve what happened

to him.  All she wanted to do was just live her life and

just enjoy life.  But now all that has been taken away

from her.  All that I have from her is memories.  I can't

talk or speak or anything to her unless I'm going to her

grave.  Your Honor, he took Dime away from me.  And to

think that her life didn't matter to him.  So today, Your

Honor, I just ask that you do the maximum sentence that's possible for him, because he should not be able to see the light of day anymore, Your Honor.  Thank you for just listening to me.

THE COURT:  Thank you, Ms. Saab.  I appreciate you coming forward.

Anything else from the government?

MR. GARNER:  No, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Kendrick or Ms. Vann.

MR. KENDRICK:  Thank you, Your Honor.  And, again, we laid a lot of this argument out in our sentencing memo, so I am not going to rehash everything we said.

I want to start with maybe some broad points that I would ask you to consider.  And maybe I will start at the very end, which I've told Mr. Ritter -- and we know we are asking you for a variance not to some small or insignificant sentence.  We are just asking you to impose a term of years on Mr. Ritter, as opposed to life sentence.  And the reason for that I think starts in a couple of places.

In the system we are in, the procedure requires the sentencing hearing to be very separate from the trial.  But I also think that there's some meaning to that, that this is a different proceeding than a trial.  There's

often this problem when I stand up because I'm thinking my

client's maintained his plea of not guilty and has

procedures past today and won't be able to show remorse in

the things that are often our greatest ally at a

sentencing hearing.  But really, under our Constitution

and our system, he's lost the acceptance of

responsibility.  And other than that, we can't really

consider that he went to trial as part of his sentence.

So when I think about the broader strokes of what

I would like Your Honor to know about Mr. Ritter, I can,

as a lawyer and as an advocate, and even Mr. Ritter as a

defendant, can have respect for the jury's decision and

respect for Your Honor's decision.  We can have respect

for the sorrow that runs through this courtroom and the

loss to humanity any time a life is gone, yet still ask

Your Honor to bestow some level of mercy.

And I think the reasons that support that

philosophically are that the federal sentencing is based

on the idea of not sentencing someone to a

greater-than-necessary sentence.  I think a lot when I

stand in these courtrooms.  And I think that Ms. Vann and

I have done a tremendous amount of murder sentencings in

our careers.  What we have done in our lives is the worst

thing we could think of.  We think back over the years and

cringe at -- we wonder, should that define us.  And we

1    hope it does not.

2           At the same time, you know, I guess in relation

3    to that, Your Honor, two things can be true.  There can be

4    a crime here.  There can be horrible violence.  And there

5    can still be some level of redemption.  And I would ask

6    Your Honor to consider the sentence that you impose.  And

7    what I'm asking for is in no way a commentary on the value

8    of the life that was lost.  And I have, unfortunately, had

9    to say that more than I wish I ever did, because I think

10   there's a lot of violence that we deal with, and

11   especially in the roles that we all play here.

12          But that being said, you know, we still need to

13   think about the 3553 factors.  And some of those are

14   directly related to what you heard from the government and

15   what happened here, and some are not.  And I think that it

16   would be frivolous for me to argue with Mr. Garner's

17   position on the facts that have been found by both the

18   jury and, uniquely in this case, by Your Honor.

19          Sometimes we don't go into the detail we went

20   into with our post-trial motions, but we have an insight

21   into your view of the case from both your ruling and your

22   ruling today.  And I don't want to take issue with that,

23   because I don't think that's appropriate right now.

24          Asking for mercy, Your Honor, I think that the

25   common refrain is, does Mr. Ritter deserve mercy.  And the

answer is no, because mercy is not deserved, it's given.

And the power that we derive for mercy comes from the

person who holds it.  And today that's you.  Not that it's

ever deserved, that's not consistent with the concept.

So the reason that we would ask you for some

level of mercy for Mr. Ritter is that the picture you have

seen of him at trial is certainly a picture that you and

the jury have found to have some accuracy.  But it isn't

the only thing there is about him.  I think a life

sentence implies that there is no part of him that can be

redeemed, because you ultimately leave someone to die in

prison.

And what we learned about him, as Your Honor

knows, like all federal murder cases, this started with a

potential for capital punishment.  So there's a tremendous

amount of learning we do about a person that we maybe

don't have the opportunity to do in another case.  So we

know that Mr. Ritter was born with drugs in his system.

We know that he grew up in an unstable and turbulent life,

that at a very young age, he was subjected to abuse.  He

was subjected to substance abuse.  He was living on the

streets of Brooklyn, New York City, by himself, trying to

make his way.  He didn't have a sense of stability.  He

didn't have a good sense of family.  He didn't have the

kind of things I think we take for granted in our world

1    that involves structure.

2         And if that was the end of the story, then I

3    think you wouldn't have much you could do.  But there's

4    this place on page 9 of our memo that we tell you about

5    when he became old enough to work.  So he was late teens,

6    he went to work for the Brownsville Community Justice

7    Center.  And these are people who deeply believe in what

8    they do and have zero interest in telling us something

9    about Mr. Ritter that isn't true or would be favorable but

10   undeserved.

11        And we also interviewed these people after he had

12   been arrested, after what you have now and the jury

13   determined happened had been accused.  In the world that

14   is outside of this courtroom, sometimes people don't draw

15   distinctions.  So these folks knew what he had been

16   accused of, that it was violent, that it had cultural

17   implications, that it was more than a regular crime.  But

18   they still said, you know, that isn't what we saw from him

19   when he was 18-, 19-year-old and he worked with us, that

20   he was a mentor to young men, that he was empathetic, he

21   was able to work on his own.

22        And the reason that that matters is because,

23   again, not asking you for some tiny sentence or for some

24   probationary sentence, I'm asking you for a term of years.

25   I would maybe draw the comparison, because despite what

the guidelines say, the statute gives you, essentially,

the ability to impose any sentence.  In the state system

we deal with murders on a spectrum from 30 to life.  And I

don't know how to quantify what we deal with in that

system, but, certainly, there are plenty of people who

receive closer to 30 than life, even in violent crimes.

And I think a lot of that has to do with whether they have

any potential to be redeemed.

And the example I just gave you, I think, works

in Mr. Ritter's favor.  You know, he was very young when

this crime committed.  He's 22 years old.  There was a

time when that wasn't so young to me.  But now I realize

how young it is.  And I realize -- not just I realize

this, but I think the U.S. Supreme Court, courts all

around the country realize that is still an age where the

brain isn't developed, where people haven't gained impulse

control.  They haven't gained decision-making skills they

need.

One of the other things you will notice, Your

Honor, we included a number of letters.  It is a historic

practice of mine that if there's some mention of how the

person didn't commit the crime or they think that someone

is innocent, I will not include this.  The reason I

included them is because, regardless of your position on

what happened, I wanted you to know that there is a family

structure and a group of people who believe that this

crime would be an anomaly for Mr. Ritter, that this isn't

how they know him.  And, ultimately, that's how -- what

the 3553(a) factors accomplish, in addition to respect for

the facts the government cited.

And in addition to counting violence and the

terrible impact that Mr. Garner has stated, that I will

not dispute, there are other pieces.  There are other

parts.  And there are other pieces and parts of Mr.

Ritter.  And that's what I want you to know about.

And it's probably counter-productive to write

some 100-page novel about his life, but I think we have

covered for you the fact that, you know, he's more than

what you saw in this trial.  He has children.

You know, we, in cases like this, spend far more

time dealing with our client.  So we know about his

children.  I think it's confusing in the letters and the

memo, because it says there are three, but, essentially,

he has one child that is not his biological child, which I

understand he married the mother and treats her just like

a child -- the other biological children.  And he will

likely not see them.  If you granted the mercy I'm asking

you, he won't see them until they are fully realized

adults.

So I just wanted you to know that prior to this

incident and prior to showing up in this courtroom, there

was more to him. And that's what our memo reflects.

I think that what Mr. Garner addresses are the

nature and circumstances of the offense, respect for the

law, protection of the public, some deterrence, and I

think those are fair considerations that the statute asks

you to do. I'm asking you to look at history and

characteristics. I'm asking you to look at even his need

for vocational, educational -- because I think that if you

thought he was taking all these classes while sitting in

the jail, despite knowing this day was coming and knowing

that some of those classes he was working on very

recently, though we have to be honest with him and tell

him, even if you were to grant us any measure of mercy,

it's not going to mean that he's going to be out any time

soon, and he's bettering himself. And one of those

factors in 3553 is that. And I think it's important to

say, could he ever use that to help society? And that

would be a nonlife sentence, some term of years.

So I don't disrespect what we've heard in here

about the violence and about the pain and the loss, and

neither does Mr. Ritter. And I think that what we are

asking you to do is, on balance decide, based on not just

the trial and not just the facts you heard and the facts

that you properly cited to support your sentence, but the

1    other facts we presented that make him a family member, a

2    dad, a brother, a son, the idea of him struggling as a

3    young child, the fact that there may never have been a day

4    that he had any semblance of structure or peace, should at

5    least weigh.

6          And the only answer I'm asking you to reach is

7    that he has got some level -- I don't know if this is the

8    right word, but redeemability, that he could be redeemed,

9    that after a long, structured sentence in a federal

10   prison, that he could be something more than what you saw

11   at the trial and what you and the jury found.  And that is

12   a big ask, because it means we have to at least balance

13   retribution with some level of rehabilitation.  But if we

14   can do that, if we can fashion a sentence that respects

15   retribution, but does give some hope for rehabilitation,

16   even if it's not what feels right or it's not what is

17   easy, if it's sufficient but not greater than necessary,

18   then that is one of the words in the federal code, one of

19   the phrases that actually means something and gives you

20   some power to do something positive, despite the fact that

21   everything we've heard has been terrible and not disputed.

22         Whether I dispute what my client did, that

23   doesn't change most of what the government reviewed.  So I

24   would ask Your Honor to consider, based on that childhood

25   turbulence, based on the length of time -- I mean, you

will be giving him most of his life sentence even if you
granted my variance. So you are not in any way letting
him off the hook. The mercy that would be granted him,
even if it's any amount, will not in any way be
disrespecting what happened, nor will it not be a very,
very severe level of punishment.

If you will give me one second, Your Honor. Just
in closing, we would ask that you consider a term of
years. We recognize that it would be a high term of
years, but that you leave at least some possibility for
that redemption we asked for.

THE COURT: Is there anybody that wishes to
speak?

MR. KENDRICK: No, Your Honor. I think we
covered the speaking in the letters that we sent you.

THE COURT: I certainly reviewed them.

MR. KENDRICK: And Mr. Ritter may want to address
you; not family members, Your Honor.

THE COURT: I'm happy to hear from Mr. Ritter.

THE DEFENDANT: Good afternoon, Your Honor.

THE COURT: Good afternoon.

THE DEFENDANT: I wrote you a letter while I was
incarcerated. I just wanted you to hear it. I started by
saying, Dear Honorable Judge Lydon, Your Honor, I'm here
today to ask for mercy, compassion, even sympathy in

determination of my sentencing. I would like to take the opportunity to speak, the opportunity which I was denied throughout this procedure.

First, I'm aware of the process and procedure that led us here today. I do not mean any harm or disrespect to you, Your Honor, or to the victim's family. But today I am here standing on my innocence.

I was advised not to speak or testify, but my silence played the biggest part in the reason why I'm here today. There were times when questions were asked that only I could answer. And I remained quiet and allowed opinions and lies to become facts.

This may be my last chance to ever speak, and I need you, Your Honor, and Doe's family, to know I did not murder Doe. I need y'all to hear it from me out of my mouth.

During the trial, you heard assumptions, allegations, and assassination of my character by people who do not know me. I want to take the time to explain to you who Daqua Lameek Ritter is. I'm a son, an uncle, a brother, a grandson. I'm a father of three, two boys and one girl. I'm a youth advocate. I'm forgiving. I'm loving. I'm creative, brave, socially intelligent, kind, hopeful. I have self-regulation, humility, gratitude, grit, perseverance, understanding, awareness.

I'm human, so I'm far from perfect.  I made mistakes in my life.  Your Honor, please consider before this situation I never spent 30 days in jail or in prison.  Your Honor, I am not a killer.  I am not homophobic.  In my past experience as a youth advocate, I worked with boys, girls, young adults with mixed perspectives on gender identity, youths of all races and ethics.  I'm from my very diverse city.

Your Honor, I'm thankful for my counsel.  They did an amazing job.  But there are requests that wasn't met, and if they were, I would not be standing here in front of you today, Your Honor.  First, I asked for a bench trial on three different occasions, in which I was ignored and denied.  I was told if I continued to pursue a bench trial, I would be without counsel.  This left me in complete fear, never being in this position before.

Secondly, I asked to testify on my own behalf and asked for preparation.  I was ignored and denied again.

Lastly, I asked to strike Juror 71 during jury selection while my one strike without cause was available.  I was advised not to and ignored.  If these requests was met, I would not be here today standing in front of you, Your Honor.

I can only ask you take into consideration the certificates I earned in the midst of my hard time and

1   troubles.  I'm in the process of developing a nonprofit

2   organization for court intervention focusing on youth,

3   mental health, workforce, education, prevention of

4   incarceration, and social-emotional skills.  I have been

5   praying, hoping, and now begging Your Honor to take all

6   these considerations and not sentence me to life.

7          Thank you for your time.  If there's any

8   questions that you or the victim's family have, I'm more

9   than willing to answer with the utmost respect and

10  honesty.

11         THE COURT:  All right.  Thank you, Mr. Ritter.

12         Mr. Kendrick, was there anything else?

13         MR. KENDRICK:  That's all, Your Honor.  Thank

14  you.

15         THE COURT:  Mr. Garner, did you have anything

16  else?

17         MR. GARNER:  Your Honor, just very briefly,

18  reflecting upon Mr. Ritter's comments here this afternoon,

19  I think they show a blatant disrespect to the judicial

20  process as well as the jury's verdict.  Earlier this year,

21  it is evident through argument of his counsel as well as

22  comments from Mr. Ritter that he's pleading with the Court

23  to show mercy and compassion, which I find ironic because

24  those are the very things that he deprived Dime Doe of.

25         And so today, we ask that the Court balance the

1   3553(a) factors and sentence him to a term of imprisonment

2   of life.

3           THE COURT:  All right.  I'm going to step out

4   just for a moment.  I will be right back.

5           (Whereupon, a recess is taken.)

6           THE COURT:  As we go back on the record, let me

7   note that when I was stating the applicable guideline

8   range, I failed to state the guideline range as to

9   supervision.  I think I referred to the statutory

10  requirements, but not the guidelines.  So let me say, as

11  to Counts 1 and 2, the guideline range for supervision is

12  two to five years.  And the guideline range as to Count 3

13  is one to three years.  So I wanted to correct the record.

14  Is there any objection to that stated range?

15          MR. GARNER:  No, Your Honor.

16          THE COURT:  From the defendant?

17          MR. KENDRICK:  No, Your Honor.

18          THE COURT:  Okay.  My apologies.

19          All right.  I'm ready to pronounce sentence.

20  Pursuant to the Sentencing Reform Act of 1984, it is the

21  sentence of the Court that the defendant, Daqua Lameek

22  Ritter, is hereby committed to the custody of the Bureau

23  of Prisons to be imprisoned for a term of life, consisting

24  of life as to Counts 1 and 2, and 240 months as to Count

25  3, said terms to run concurrently.

1          The Fourth Circuit Court of Appeals' decision in

2     *U.S. v. Kratsas* sets forth that the Court must apply the

3     three-part test articulated by the Supreme Court in *Solem*

4     *v. Helm*, which recognizes that an extensive

5     proportionality analysis is required in cases involving

6     the imposition of a life sentence.  And I have conducted

7     that analysis.

8          Applying *Solem's* first prong, the gravity of the

9     offense, I find the defendant murdered Ernest Devontay

10    Doe, also known as Dime Doe, the 25-year-old black,

11    transgender woman, by shooting her three times in the head

12    with a .25 caliber handgun on a rural county road in

13    Allendale, South Carolina.  He created a plan to

14    willfully, deliberately, and maliciously kill Dime Doe

15    with malice aforethought because of her actual or

16    perceived gender identity, after learning she had

17    publicized their secret sexual relationship.  And he

18    wanted to silence Doe from further disclosing their

19    relationship so that others would not question his sexual

20    orientation.

21         When the defendant was unsure if Doe was dead

22    after shooting her once in the head as she sat in her car,

23    he returned to the car and shot her in the head two

24    additional times to ensure that he had successfully killed

25    her.

1      Applying *Solem*'s second prong, comparing the

2  sentences imposed on other defendants in the same

3  jurisdiction, the Court finds a life sentence for the

4  premeditated murder of another person is not

5  disproportionate in comparison with other sentence in this

6  district under the United States Sentencing Guidelines.

7      I've also compared this sentence with other

8  sentences of this magnitude that this Court has imposed.

9  And I find that a life sentence without parole is

10 sufficient but not greater than necessary in this case.

11 The government also addressed this issue of the comparison

12 to other cases in other jurisdictions.

13     Applying *Solem*'s third prong, comparing the

14 sentences imposed on other criminals in other

15 jurisdictions, the Court finds a review of the state

16 sentences within this circuit, as well as sentences

17 imposed in the United States district courts and other

18 circuits, provides for the existence of similarly severe

19 sentences for the premeditated murder of another to the

20 magnitude here.

21     It appears the defendant does not have the

22 ability to pay a fine; therefore, the fine is waived.  The

23 defendant shall pay the mandatory $300 special assessment

24 fee.

25     It is further ordered that the defendant shall

1   pay restitution in the amount of $980.76 to the victim

2   noted in paragraph 84 of the presentence report.  These

3   payments shall be made to the clerk, U.S. District Court,

4   right here at 901 Richland Street, Columbia, 29201.

5   Restitution is due immediately.  And interest on the

6   restitution is waived based on the Court's finding that

7   the defendant does not have the ability to pay such

8   interest pursuant to 18 U.S.C. 3612(f).

9          Should the defendant be released from

10  imprisonment, the defendant shall be placed on supervised

11  release for a term of five years, consisting of five years

12  as to Counts 1 and 2, and three years as to Count 3, said

13  terms to run concurrently.

14         Mr. Kendrick, have you gone over the mandatory

15  conditions of supervision?

16         MR. KENDRICK:  We just went over them right

17  before the hearing.  And we will waive you reading those,

18  if that's acceptable to the Court.

19         THE COURT:  Yes.  Thank you.  While on supervised

20  release, the defendant shall comply with the mandatory

21  conditions of supervision outlined in 18 U.S.C. 3583(d)

22  and the United States Sentencing Guideline Section

23  5D1.3(a), and the standard discretionary conditions

24  outlined in United States Sentencing Guideline Section

25  5D1.3(c) as noted in paragraphs 146 and 149 of the

1    presence report that I'm adopting in full.

2          Standard conditions of supervision 1 through 9

3    serve the statutory sentencing purposes of public

4    protection and rehabilitation pursuant to 18 U.S.C.

5    3553(a)(2)(C) and (D).

6          Standard conditions of supervision 10 and 12

7    serve the statutory sentencing purpose of public

8    protection pursuant to 18 U.S.C. 3553(a)(2)(C).

9          Standard condition of supervision 11 ensures the

10   defendant does not engage in activities that might

11   potentially conflict with other conditions of supervision

12   or which might pose a risk to his probation officer.

13         The defendant shall also comply with the

14   following special conditions for the reasons set forth in

15   the presentence report, which I've previously adopted as

16   the finding of facts for purposes of sentencing.  You must

17   have no direct or indirect contact with any member of the

18   victim's family or affected parties in this matter unless

19   specifically authorized by U.S. Probation Office.  And

20   this condition is ordered to serve the statutory

21   sentencing purpose of public protection.

22         You must not incur new credit card charges or

23   open additional lines of credit without the approval of

24   the probation officer.  And this condition is ordered to

25   assist the probation office in identifying assets which

1    may be used to pay his restitution and to serve the

2    statutory sentencing purpose of public protection,

3    deterrence, and rehabilitation.

4            You must provide the probation officer with

5    access to any requested financial information and

6    authorize the release of any financial information.  The

7    probation office may share financial information with the

8    U.S. Attorney's Office.  And this condition is ordered to

9    assist probation, again, in identifying assets which may

10   be used to pay the restitution and to serve the statutory

11   sentencing purpose of public protection, rehabilitation,

12   and deterrence.

13           You must pay any remaining unpaid restitution

14   balance imposed by the Court in minimum monthly

15   installments of $150 to commence 30 days after release

16   from custody.  The restitution payment schedule shall be

17   adjusted accordingly based on your ability to pay as

18   determined by the Court.  In creating the payment schedule

19   for the restitution, the Court has considered, as set

20   forth in the presentence report, the financial resources

21   and other assets of the defendant, including whether any

22   of these assets are jointly controlled, the projected

23   earnings and other income of the defendant and any

24   financial obligations of the defendant, including

25   obligations to dependents.

1          The Court finds the defendant can satisfy monthly

2     installments of $150, given his likely future job

3     prospects and earning capacity upon release.

4          You must submit to substance abuse testing to

5     determine if you have used a prohibited substance.  You

6     must contribute to the cost of such program not to exceed

7     an amount determined reasonable by the court-approved U.S.

8     Probation Office's sliding scale for services.  And you

9     will cooperate in securing any applicable third-party

10    payment, such as insurance or Medicaid.

11         This condition is ordered based on the

12    defendant's admitted substance abuse history outlined in

13    paragraph 136 of the presentence report, and to deter and

14    detect potential future illicit drug use, to assist the

15    defendant in gaining sobriety, and to serve the statutory

16    sentencing purposes of public protection, rehabilitation,

17    and deterrence.

18         I've certainly considered all the sentencing

19    factors that I'm required to consider at 18 U.S.C.

20    3553(a).  First, regarding the nature and circumstances of

21    the offense, it really doesn't get much more serious than

22    this offense.  A hate crime murder involves a deliberate

23    targeted killing, and here, based on the victim's sexual

24    orientation.  The particularly egregious nature of this

25    crime demonstrates intense malice and prejudice and

disregard for human life and dignity.  The fact that it
was hate-motivated amplifies the harm, as it terrorized
not only the victim, but the entire group the victim
represents.

Mr. Ritter killed Dime Doe, a 24-year-old black
transgender women, by shooting her three times in the head
because of her actual or perceived gender identity after
learning she had publicized their sexual relationship and
he wanted to silence her from further disclosing their
relationship so that others would not question his sexual
orientation.  It was cold.  It was calculated.  And it
involved shooting her not once, not twice, but three
times.  All after you promised her so that she would agree
to meet with you that you would not harm her.

I also considered the history and characteristics
of the defendant.  He's 28 years old.  He was raised by
his mother and maternal grandmother.  Raised in Brooklyn,
but spent his summers in Allendale.  I point -- the
government noted earlier when describing the senseless
nature of this crime, you could have just gone back to New
York where no one would have known about the relationship.
You could have protected your reputation as a heterosexual
male simply by leaving.

You are single.  You have an 11-year-old son, a
10-year-old son, and I know another child that you feel

1    responsible for.  You report a troubled upbringing in a

2    high-crime area of Brooklyn, New York.  And you had to

3    rely heavily on your grandmother for help due to your

4    mother's alcohol abuse, schizophrenia, and bipolar

5    disorder.

6           You are in fairly good physical health, although

7    I know you suffer from a hernia and perhaps a cyst and

8    some asthma.  You began using marijuana in your mid-teens.

9    Your criminal history consists of two misdemeanor

10    convictions for disorderly conduct in 2022 and for

11    obstruction of governmental administration.

12           You have one felony conviction in 2022 for

13    criminal possession of a weapon with intent to use, which

14    involved a verbal dispute with a stranger which turned

15    physical.  You used an unspecified weapon to cause

16    significant lacerations to the victim which required

17    hospitalization.

18           You've shown a cavalier and calculated and cold

19    willingness to kill another human being when you chose,

20    when you chose.

21           By sentencing you to life imprisonment, you will

22    no longer be a threat to others.  And this sentence

23    protects the public from further harm, and also serves as

24    a strong deterrent to those who might contemplate similar

25    crimes.

Life imprisonment reinforces the principle that murder is the most serious crime and cannot be tolerated in a civilized society.  It underscores the commitment to upholding the sanctity of life and the rule of law, given the violent nature of the crime and your criminal history, again, which includes crimes committed after Dime Doe was killed.

You argued that this was isolated and not who you are.  And I'm quite sure there is more to you. Individuals, human beings, are complicated.  I understand that.  But you do have these other crimes after the murder of Dime Doe.

I find you do pose a threat to society.  And I believe this sentence is necessary to protect the public. It's certainly necessary to promote respect for the law, reinforcing that crimes motivated by hate will not be tolerated.  I believe, again, this sentence is necessary for specific and general deterrence.  It is a sentence that should send a message to others that such heinous acts of hate will be met with severe consequences.  I also believe specific deterrence is necessary here to prevent the defendant from committing further offenses.

I've certainly considered sentencing disparities. I don't believe this sentence results in any disparities among defendants with similar criminal histories and

1    background who have been found guilty of similar conduct.

2    I've certainly considered the arguments of the government

3    today and the impact statements from the victims.

4         I've certainly considered very thoughtfully the

5    arguments of the defendant.  I've considered the

6    defendant's filings and his arguments about the 3553(a)

7    factors.

8         Your lawyer made a very strong argument for you

9    today.  It was a compelling argument.  He's argued that a

10   life sentence is not warranted here based on your

11   turbulent childhood, a childhood marked by instability,

12   abuse, and neglect, the fact that you were born with drugs

13   in your system, the back-and-forth between homes as you

14   grew up, the presence of your mother's abusive boyfriends,

15   the removal of you from your mother's care, your troubled

16   adolescence, your life on the streets in Brooklyn, the

17   suicide of a girlfriend, your good works with the

18   Brownsville Community Justice Center, your age, your

19   potential for a productive life.

20        To the extent these factors are mitigating, I

21   ultimately concluded that they are outweighed by the

22   totality of the circumstances present in this case.

23        I do believe I've calculated the advisory

24   guideline sentence correctly and addressed the points

25   raised by counsel.  I note for the record, however, that I

would have imposed the same sentence even if I
miscalculated the defendant's advisory guideline range.
Even if the second-degree murder guideline applied, I
would reach the same sentence under the 3553(a) factors.
An alternate variant sentence of life would be necessary
based on the factors at 18 U.S.C. 3553(a).

In light of the totality of the circumstances
present in this case, the sentence is necessary to reflect
the nature and seriousness of the offense, the defendant's
history and characteristics, and it's also necessary to
promote respect for the rule of law, respect for the law,
provide just punishment, afford adequate deterrence,
protect the public, and provide the defendant with
correctional treatment.

Mr. Ritter, let me say that your actions have
caused immense pain and irrevocable loss. And for that,
justice requires you to face the full weight of the law.
The consideration of the goals of sentencing that I am to
accomplish requires this sentence. The life sentence
imposed today reflects the gravity of your choices,
choices that stripped another person of life. Murder is
considered the ultimate crime because it is the deliberate
taking of a human life, violating the most fundamental
moral and legal principle, the sanctity of life.

You destroyed the most precious right a person

possesses, the right to life.  And you showed complete

disregard for her existence, her dignity, her potential.

You stripped away everything that could have been

contributed to the world through her.  No restitution or

punishment can undue the harm caused, making it a crime

that goes beyond the immediate victim, affecting all who

knew and loved her.

You made the decision that another person's life

would end the very minute you chose, you decided when her

life would end.  And you killed all the possibilities that

Dime's future held.  And with that decision to kill Dime,

you also decided that from that moment on, Dime's mother

would never have another moment with her child.  You

killed her hopes and dreams too.  Dime Doe's aunts would

never make another memory with Dime.  Cousins, friends,

all who loved Dime Doe, would never see her again.

I doubt that you thought of the consequences of

your actions on others when you pulled the trigger the

first time, the second time, or even the third time.  But

I do want you to understand them today.  This courtroom is

filled with people who will never be the same after what

you did.  You did more than kill Dime Doe that day.  Every

birthday, holiday, life milestone, becomes a reminder of

their loss.  They lose not just a loved one but also the

future moments they expected to share.  And the emotional

and psychological wounds, based on what I've read from
their statements, are deep and will be long lasting.

The act of murder that you chose here also
destroys a sense of security and trust in society.  People
start to question the safety of their surroundings,
feeling less certain about their community and their
neighbors or even strangers.  This was a senseless murder,
just senseless.  And it tells us that life can be
senselessly taken in an instant, again, making many, and
particularly the transgender community, feel very
vulnerable.

But I also cannot help but think about the impact
on you and your family by your actions.  I have read the
letters submitted on your behalf.  You were also a son
loved by a mother and a grandmother.  I've read the
letters of B.W. and Jay Lynn, of your grandmother and
mother, of your aunt, your son A.R.  You decided, when you
pulled that trigger and killed Dime, that your family
would also experience great loss.

Perhaps the most moving letter from your family
came from your brother who wrote:  Dear Judge, I hope his
letter finds you well.  I'm writing to express my deep
concern regarding my brother's situation and the impact
his potential sentencing could have on our family.  As his
only sibling, I've been there for both the pretrial and

the trial.  And I wanted to emphasize how much I do not

want my brother to spend the rest of his life in prison.

He is a father to three children, two of whom are

biologically his.  And I fear for the future of our

youngest nephew, who lost his mother two years ago.  If my

brother were to be sent away for life, this child would be

left without any parents, which breaks my heart.  I also

want to extend my sincere condolences and sympathy to the

the victim's family.  While I did not know them, I

understand the pain of losing loved ones to violence,

having lost close family members myself.  This shared

experience has given me a profound understanding of grief

and loss.  I believe in the possibility of redemption and

change.  My brother deserves a chance to be a part of his

children's lives and to contribute positively to our

family and community.  And I urge you to consider the

broader implications of his sentencing and the potential

for him to come home one day.  Thank you for taking the

time to read my letter.  I appreciate your consideration.

And I did carefully consider his letter, just as

I carefully considered the arguments of your counsel and

filings.  Again, ultimately, an evaluation of the 3553(a)

factors called for this sentence.  You caused devastating

loss.

But while you must be held accountable, I

disagree with your lawyer that this sentence somehow means

it's a finding by me that you are not redeemable.  I do

not find that at all.  Even within prison walls, there

remains the possibility of redemption and growth and

transformation.  And I urge you to seek out that path.

You've already made reference to a program that you hope

to start, and I hope you will remain committed to that.

To the defense lawyers who represented Mr.

Ritter, you have served an essential and honorable role in

your work and in our justice system.  Your dedication and

the strong defense that you've provided ensures the

integrity of our justice system and works to protect the

rights of all.  Our system is stronger with the excellence

with which you did your job.  And you did it all the while

showing great dignity to your client, which is also

important.

I know often the victim's family struggles with

this part of our system.  It is a part of what makes the

American system the very best.  We are committed to

getting it right.  The state or the government here cannot

wield its power without evidence to prove its charges and

accusations.  And you held them to that burden.

To the family of Dime Doe, let me say that her

life mattered.  I know that you knew that already, but you

have now seen it play out through the efforts of law

enforcement and these prosecutors who spent countless

hours pursuing justice for her.  You have seen a jury

return a verdict that confirms it too, and now a sentence

that reflects it.

I offer my deep sympathy.  I know there are no

words that can heal the pain you carry, but I hope that

you find some comfort, some solace in the fact that

justice is being served today.

To Dime's mother, let me say, I recall the nice

things that were said about Dime during the trial.  I was

particularly struck by the fact that Dime called you right

after being pulled over for the ticket.  That showed me

just how close you were, a lovely person, and I know that

your loss is profound.

To the family as a whole and friends, I read each

letter carefully, from Grandmother Gloria, Aunt Karen, and

the Rhonda, best friend Shanice Carter, and Cousin Sherri

Dunbar, what a terrible loss and pain is yours.  Again, I

hope that imposing the full weight of judgment here, which

was called for, is some comfort to you.  I think you

should feel proud too that Dime's death does serve as a

reminder to others that life is sacred and that those who

choose to end it will face severe consequences.  We will

not tolerate loss of life without severe consequences.

And this sentence reflects the seriousness with which

1    society holds life itself.

2          To law enforcement officers and the prosecution

3    who worked tirelessly on this case, thank you.  It was not

4    lost on me how much work it took to put the case together.

5    And you did not shy away from your burden of proof here.

6    Your dedication and professionalism and unwavering

7    commitment to justice brought us to this moment.  And you

8    have honored the memory of the victim in this case.  And

9    you have protected our community.

10         Does the government have any objections to the

11   form of the sentence imposed?

12         MR. GARNER:  No, Your Honor.

13         THE COURT:  Does the defendant?

14         MR. KENDRICK:  Nothing beyond our previous

15   arguments, Your Honor.  Thank you.

16         THE COURT:  All right.  Mr. Ritter, to the extent

17   you have the right to appeal, you have 14 days from the

18   date judgment is entered to appeal from the sentence the

19   Court has imposed.  If you cannot afford counsel for an

20   appeal, one will be appointed for you.

21         Is there anything further from the government?

22   Excuse me.  There might be something else from probation.

23         PROBATION AGENT:  Do you mind if I approach,

24   Judge?

25         THE COURT:  I don't.

1        (Whereupon, an off-the-record discussion takes

2   place.)

3        THE COURT:  Out of abundance of caution, although

4   I think defense counsel understands that I've denied the

5   variance motion, but let me make clear that I certainly

6   did.  I found that the arguments, to the extent they were

7   mitigated, were outweighed by the seriousness of the

8   offense and the totality of the circumstances and the

9   considerations I had to make under each of the factors at

10  3553(a).

11       Is there anything further from the government?

12       MR. GARNER:  No, Your Honor.  Thank you.

13       THE COURT:  From the defendant?

14       MR. KENDRICK:  No, Your Honor.  Thank you.

15       THE COURT:  All right.  We are adjourned.  Thank

16  you.

17       (Whereupon, the proceedings are adjourned.)

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF REPORTER</u>

2

3        I, Karen V. Andersen, Registered Merit Reporter,

4   Certified Realtime Reporter for the State of South Carolina

5   at Large, do hereby certify that the foregoing transcript is

6   a true, accurate and complete Transcript of Record of the

7   proceedings.

8        I further certify that I am neither related to nor

9   counsel for any party to the cause pending or interested in

10  the events thereof.

11

12

13

14

15  _____
    Karen V. Andersen
16  Registered Merit Reporter
    Certified Realtime Reporter

17

18

19

20

21

22

23

24

25